**E-FILED**
Friday, 15 January, 2010  05:12:12 PM
Clerk, U.S. District Court, ILCD

### IN THE UNITED STATES DISTRICT COURT
### FOR THE CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| DAWN T. FULLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  08-3292 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

### <u>OPINION</u>

JEANNE E. SCOTT, U.S. District Judge:

Plaintiff Dawn T. Fuller appeals from a final Decision of the Social Security Administration (SSA) denying her application for Supplemental Social Security Income (SSI) under Chapters II and XVI of the Social Security Act, 42 U.S.C. §§ 423, 1381a.  Plaintiff brings this appeal pursuant to 42 U.S.C. § 405(g).  Plaintiff filed Plaintiff's Motion for Summary Judgment or Remand (d/e 9) and Plaintiff's Memorandum in Support of Motion for Summary Judgment or Remand (d/e 10).  Defendant has filed a Motion for Summary Affirmance (d/e 13) and Commissioner's Memorandum in Support of Motion for Summary Affirmance (d/e 14).

1

Plaintiff then filed Plaintiff's Reply in Support of her Motion for Summary Judgment or Remand (d/e 15).

For the reasons set forth below, the Court determines that the SSA's Decision is not supported by the evidence.  Plaintiff's Motion is granted, and the Commissioner's Motion is denied.  The Commissioner's Decision is reversed, and this case is remanded pursuant to 42 U.S.C. § 405(g), Sentence 4, for further proceedings consistent with this Opinion.

## FACTS

Plaintiff Dawn T. Fuller is a 41-year-old woman who has previous work experience as a mail clerk, data entry clerk, retail cashier, machine operator, assembler, and hand packager.  Answer (d/e 7), Ex. A, Social Security Transcript (Tr.), at 160.  She alleges a disability onset date of January 15, 1994.

## I.   MEDICAL HISTORY

The medical records in this case date back to December 29, 2002, when Plaintiff was admitted to the emergency room at Decatur Memorial Hospital in Decatur, Illinois, with chest pain.  Tr. at 325.  She admitted to physicians that she had been consuming alcohol and smoking marijuana laced with cocaine.  Tr. at 325.  Examinations revealed that Plaintiff also

2

had a sprained foot and broken toe.  <u>Tr.</u> at 329.

On November 27, 2003, Plaintiff was taken to St. Mary's Hospital in Decatur, Illinois, via ambulance after she was found non-responsive at her home.  <u>Tr.</u> at 564.  She was diagnosed with depression and a drug overdose. Plaintiff stated that she injected heroin and cocaine because "the holiday time [] overwhelmed her."  <u>Tr.</u> at 564.  Plaintiff later stated to physicians that she was not trying to commit suicide, and doctors recommended that she obtain psychiatric treatment.  <u>Tr.</u> at 565.

Plaintiff sought mental health treatment at Heritage Behavioral Health Center in March 2005.  <u>Tr.</u> at 511.  She was diagnosed with major depression, cocaine dependency, and opiate dependency.  Her treating doctor assessed her a Global Assessment of Functioning (GAF) score of 50, noting that Plaintiff felt "down, angry and isolate[d] from others."[1]  <u>Tr.</u> at 512.  Heritage created a comprehensive treatment plan to help Plaintiff deal with her depression and overcome her drug addictions.

On April 2, 2005, Plaintiff was admitted to Decatur Memorial

---

[1]The GAF scale was designed to "report[] the clinician's judgment of the individual's overall level of functioning."  American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> 32 (4th Ed. 2000).  A score between 31 and 40 represents "major impairment in several areas," and a score between 41 and 50 indicates "[s]erious symptoms" and "serious impairment in social, occupational, or school functioning . . . ."  <u>Id.</u> at 34.

Hospital after she tried to commit suicide by overdosing on Xanax and Klonopin.  Tr. at 313.  Plaintiff later denied that she had tried to commit suicide.  Laboratory testing discovered that she had cocaine and opiates in her system in addition to alcohol and prescription drugs.  Tr. at 316.

Plaintiff was transferred to McFarland Mental Heath Center on April 6, 2005.  Tr. at 504.  She remained there until April 11, 2005, and was diagnosed with major depressive disorder, a possible substance-induced mood disorder, and alcohol, cocaine, and heroin abuse disorder.  Tr. at 506. Plaintiff told doctors that she had been sexually abused by her brother when she was 11 years old.  Tr. at 504.  She was assigned a GAF score of 40.  Tr. at 506.  Ultimately, Plaintiff was released to an outpatient substance abuse treatment program.

On April 20, 2005, Plaintiff returned to Heritage, where she was diagnosed with major depressive disorder with psychotic features.  Tr. at 525.  She told doctors that she felt paranoid, and that people were out to get her.  Plaintiff was prescribed Effexor, and assigned a GAF score of 45. She returned to Heritage on May 18, 2005, and was again diagnosed with major depressive disorder; this time, she was assigned a GAF score of 53. Tr. at 527.

Plaintiff went to the emergency room at St. Mary's Hospital on June 6, 2005, and was admitted to the psychiatric ward on June 14, 2005. Plaintiff complained of hallucinations, paranoia, delusions, and verbalized suicidal thoughts. Tr. at 529. A drug test was positive for cocaine and cannabis. Doctors diagnosed her with bipolar disorder, and chemical dependency. Tr. at 529. She told doctors that she was hearing voices that were telling her to hurt herself, and that her prescription medication was making her tired. Tr. at 531. Treatment notes indicate that Plaintiff was depressed, and that she believed that her overdose was caused by someone putting Xanax in her drink. Tr. at 541. Plaintiff continued to have hallucinations and said that she saw spiders. Tr. at 542.

From August 18, 2005, to December 23, 2005, Plaintiff was incarcerated at the Dwight Correctional Center after she was convicted of retail theft and criminal trespass of a residence. Tr. at 618. She continued to receive psychiatric treatment, and was diagnosed with poly-substance dependence, psychotic disorder, and bipolar disorder. The psychologist noted that Plaintiff was happy and cooperative, and that her affect was appropriate. Tr. at 623. She tested positive for Hepatitis C. Tr. at 607. On October 17, 2005, she was diagnosed with major depressive disorder and

cocaine dependence. <u>Tr.</u> at 625. Plaintiff told her doctors that she had not received her psychiatric medication since she was imprisoned in August 2005. <u>Tr.</u> at 607.

Plaintiff returned on January 20, 2006, to Heritage for treatment relating to her depression and hallucinations. <u>Tr.</u> at 633. She was paranoid and verbalized suicidal ideations. The counselor noted that Plaintiff had been imprisoned and had not been taking her medication. Plaintiff again reported physical and sexual abuse by her brother. <u>Tr.</u> at 633. Treatment notes indicate that Plaintiff had not used heroin or cocaine for 7 months, and that her substance abuse disorder was in remission. <u>Tr.</u> at 634. She was diagnosed with major depression, and assigned a GAF score of 52. <u>Tr.</u> at 636.

On April 4, 2006, Plaintiff was again admitted to the psychiatric ward at St. Mary's Hospital after she tried to kill herself by overdosing on Risperdal, cocaine, and alcohol. <u>Tr.</u> at 642. She was diagnosed with bipolar disorder and chemical dependency. <u>Tr.</u> at 643. She told doctors that she had trouble trusting people, but that she was able to gain strength through her religious beliefs. <u>Tr.</u> at 647. Plaintiff indicated that she was attending Narcotics Anonymous and Alcoholics Anonymous while in the hospital, and

stated that she would continue to attend after she was discharged.  <u>Tr.</u> at 650.

Plaintiff saw Dr. Stephen Vincent for a mental status assessment and psychological evaluation on April 24, 2006.  <u>Tr.</u> at 692.  Plaintiff told Dr. Vincent that she had worked one day two months earlier, but that she had walked off the job because she "couldn't be around other people."  <u>Tr.</u> at 692.  She noted that she distrusted others, was paranoid, and had experienced abuse as a child.  Plaintiff discussed nightmares, mood swings, and difficulty bonding with others.  Dr. Vincent noted that Plaintiff had been hospitalized for psychiatric issues in the past, and that she was diagnosed with Hepatitis C.  Plaintiff complained of trouble sleeping and depression, but denied hallucinations.  She also told Dr. Vincent that she was living with an uncle, but had previously been homeless.  <u>Tr.</u> at 693.  Dr. Vincent diagnosed her with major depression, posttraumatic stress disorder (PTSD), and poly-substance abuse and dependence, which was in remission. <u>Tr.</u> at 695.  Dr. Vincent commented that Plaintiff was "rather hypervigilant and easily startled. . ., as well as easily distracted."  <u>Tr.</u> at 692.

On May 16, 2006, the state agency conducted a Psychiatric Review Technique.  Dr. Howard Tin found that Plaintiff satisfied the Paragraph A

criteria under Listing 12.04 Affective Disorders, Listing 12.06 Anxiety-Related Disorders, and Listing 12.09 Substance Abuse Disorders.  <u>Tr.</u> at 696.  However, under the Paragraph B criteria Dr. Tin found that Plaintiff was only mildly or moderately limited in activities of daily living, social functioning, maintaining concentration, persistence, or pace, and had only had one or two episodes of decompensation.  <u>Tr.</u> at 706.  He found that she did not satisfy the Paragraph C criteria.  <u>Tr.</u> at 707.

The state agency also performed a Mental Residual Functional Capacity Assessment (RFC).  Plaintiff was found to be only moderately limited in her ability to follow short instructions and concentrate for an extended period of time.  <u>Tr.</u> at 710.  Dr. Tin determined that her ability to interact socially was moderately limited, but found that she was not significantly psychologically limited in her ability to complete a work day and a work week.  <u>Tr.</u> at 711.

In September 2006, Plaintiff went to the Capitol Community Health Center, complaining that she had been off of her medication for months and stating that she wanted to resume taking it.  <u>Tr.</u> at 774.  Plaintiff reported that she was hallucinating, hearing voices, and having paranoid thoughts.

II.    ADMINISTRATIVE HISTORY

Plaintiff applied for SSI benefits on February 23, 2006, alleging a disability onset date of January 15, 1994. Tr. 160. On May 19, 2006, the SSA denied her application. Tr. at 99. Plaintiff requested reconsideration, but the SSA on August 10, 2006, again denied her application. Tr. at 106.

A.    First Administrative Hearing

On August 12, 2006, Plaintiff requested a hearing before an administrative law judge (ALJ). Tr. at 112. Plaintiff's hearing was held via video conference on November 9, 2006, before ALJ Alice Jordan. Tr. at 27. Plaintiff appeared with her attorney in Springfield, Illinois, and the ALJ appeared with vocational expert Ronald Malik (Malik) in Peoria, Illinois.

Plaintiff testified at the hearing that she was 38 years old, approximately 5 feet, 4 inches tall, and weighed about 170 pounds. Tr. at 35. She said that she was not and had never been married, and that she had four children, ages 12, 9, 8, and 4. Tr. at 36. Plaintiff told the ALJ that the two youngest children lived with her and her fiancé. Tr. at 37. Plaintiff's 8-year-old daughter received SSI benefits for asthma. Tr. at 37. Plaintiff had a medical card and received food stamps. Tr. at 38. Plaintiff left high school after her sophomore year, but Plaintiff earned her GED in 1987. Tr.

9

at 38.

Plaintiff stated that she had last been employed in 1999, when she worked for six months sorting mail at a bank in Decatur, Illinois.  Tr. at 39-40.  She testified that she had also worked as a cashier in a grocery store and on an assembly line in a factory; Plaintiff said she was fired from the latter position because she was not "fast enough."  Tr. at 40-41.  Plaintiff also stated that she had been employed on a temporary basis doing data entry for the State of Tennessee in 1993.  Tr. at 58-59.

During the days, Plaintiff testified that she stayed home and watched television.  Tr. at 41.  Although she liked to read, Plaintiff could not concentrate long enough to do so.  She did not do any cooking, but she was responsible for cleaning the apartment, doing laundry, and occasionally washing dishes.  Tr. at 41-42.  However, she stated that her fiancé did more of the household chores than she did.  Tr. at 42.  Plaintiff was able to maintain her personal hygiene and play with her children, and stated that she did not have any hobbies.  Tr. at 43.  Plaintiff stated that the voices in her head prevented her from going to church and from praying.  Tr. at 45.  She sometimes went to the grocery store with her fiancé, but that they did not go out on dates because Plaintiff felt paranoid when she was around

other people.  <u>Tr.</u> at 56.  Plaintiff's mental-health case worker was responsible for taking her to doctors' appointments for herself and her children.  <u>Tr.</u> at 56-57.  The case worker also helped Plaintiff maintain and keep a calendar, since Plaintiff had trouble concentrating and was forgetful. <u>Tr.</u> at 57.

Plaintiff testified that she smoked a pack of cigarettes a day, and that, while she had struggled with alcohol and drug abuse in the past, she had not used alcohol or drugs since April of 2006, when she tried to commit suicide by overdosing on cocaine.  <u>Tr.</u> at 44-45.  She said that she tried to commit suicide because demonic voices in her head told her to do it.  <u>Tr.</u> at 45. Plaintiff took Geodon and Lexapro to help "stop the voices and hallucinations." <u>Tr.</u> at 48.  Specifically, she said that spirits, such as that of her deceased grandmother, spoke to her.  <u>Tr.</u> at 48.  In terms of side effects from the medication, Plaintiff said that she shook, bit her tongue, and felt like a "zombie" and "out of it." <u>Tr.</u> at 50.  Plaintiff told the ALJ that as a girl she had been forced to attend church, and that she was sexually abused. <u>Tr.</u> at 50.

Plaintiff said that she had been on parole for a year after she was caught shoplifting.  <u>Tr.</u> at 46.  Prior to that incident, Plaintiff had been in

11

trouble with police on a few occasions for battery.  <u>Tr.</u> at 51.  She stated that she had started having social and mental problems while in high school, when she started remembering things from her abusive childhood.  <u>Tr.</u> at 52.  Plaintiff tried to conceal her problems by abusing alcohol and drugs. <u>Tr.</u> at 52.  She stated that in addition to the April 2006, suicide attempt, she had tried to kill herself in April 2005, by overdosing on various prescription medications, and in November 2003, by injecting large amounts of cocaine and heroin.  <u>Tr.</u> at 53-54.  Plaintiff testified that she did not use illegal drugs for recreational purposes.  <u>Tr.</u> at 55.

In terms of physical impairments, Plaintiff testified that she had difficulty lifting things because she had injured her back as a young girl when she fell off playground equipment.  <u>Tr.</u> at 49.  She said that she could not lift 25 pounds, but that she could lift a laundry basket and pick up her 4-year-old child.  <u>Tr.</u> at 50.  Plaintiff noted that bending was also difficult for her.  <u>Tr.</u> at 49.

Malik, the vocational expert, also testified at the hearing.  He said that he was familiar with jobs existing throughout the State of Illinois, and that he had reviewed all the medical records and other exhibits submitted by Plaintiff to support her claim.  <u>Tr.</u> at 57-58.  He noted that Plaintiff had

worked as a mail sorter, date-entry clerk, cashier, small products line assembler, and cut-off machine operator.  Tr. at 60.  These jobs were either unskilled or semi-skilled, and with sedentary, light, and medium physical exertion levels.  Tr. at 60.  The ALJ presented Malik with a hypothetical person with Plaintiff's educational background capable of performing one- or two-step jobs with infrequent interaction with co-workers and the public. Malik testified that this person would be able to do Plaintiff's past work as a mail sorter, date-entry clerk, machine operator, and small product line assembler.  Tr. at 61.  Malik stated that all of these positions would be available even if the hypothetical person was limited to occasional interactions with co-workers and the public.  Tr. at 61.

The ALJ issued a written Opinion denying Plaintiff's application on December 8, 2006.  Tr. at 84-90.  The ALJ went through the SSA's five-step sequential evaluation process for determining disability.  She found that Plaintiff had not engaged in substantial gainful activity (SGA) since January 15, 1994, and that Plaintiff's depression was a severe impairment.  Tr. at 86.  However, at Step 3 the ALJ found that Plaintiff's depression did not meet or medically equal the relevant requirements laid out in Listing 12.04. Tr. at 86.  Specifically, the ALJ found that, although Plaintiff satisfied the

Paragraph A criteria, she did not satisfy either the Paragraph B or Paragraph C criteria.  Plaintiff did not meet the Paragraph B criteria because she performed activities of daily living, was socially active with her fiancé and two of her children, and had no problems with concentration or pace, given that she was able to watch movies and television with her children.  <u>Tr.</u> at 86-87.  The ALJ found that Plaintiff failed to satisfy the Paragraph C criteria because she had not had repeated episodes of decompensation beyond those induced by Plaintiff's illegal drug and alcohol abuse.  <u>Tr.</u> at 87.

The ALJ moved on to Step 4, and determined that Plaintiff had the RFC to perform medium exertional work limited to one- or two-step tasks, with limited interaction with co-workers and the public.  <u>Tr.</u> at 87-88.  Considering all the evidence, the ALJ found that, while Plaintiff's depression could cause the symptoms she experienced, Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely credible."  <u>Tr.</u> at 88.  The ALJ went through the medical evidence Plaintiff had submitted, noting that she had been diagnosed with major depressive disorder, and that her GAF scores were in the 40-52 range.  The ALJ determined that any ill effects Plaintiff experienced were aggravated by her abuse of alcohol and illegal drugs.  <u>Tr.</u> at 89.  Because

"the objective medical evidence" did not support Plaintiff's claims, the ALJ held that the RFC determination was justified. <u>Tr.</u> at 89.

Thus, the ALJ concluded that Plaintiff could return to her past work as a mail sorter, cashier/checker, cashier, machine operator, or small product line assembler. <u>Tr.</u> at 89. Accordingly, the ALJ found that Plaintiff was not disabled for SSI purposes, and denied her claim.

B.      <u>Second Administrative Hearing</u>

Plaintiff appealed the ALJ's initial Decision to the SSA's Appeals Council, which remanded the case for a new hearing on September 19, 2007. <u>Tr.</u> at 95. The Appeals Council specifically directed the ALJ to: (1) allow Plaintiff to review evidence the ALJ received from a third party after Plaintiff's hearing; (2) perform a more comprehensive evaluation of Plaintiff's mental condition regarding the Paragraph B criteria in Listing 12.04; (3) provide evidentiary support for the conclusion that Plaintiff could perform medium exertional work; (4) explain how the ALJ concluded that Plaintiff's previous work experience constituted "past relevant work;" and (5) properly evaluate Plaintiff's alleged alcohol and drug abuse to determine whether they were "contributing factors material to the determination of disability." <u>Tr.</u> at 96-98.

15

Plaintiff's second administrative hearing was held on December 10, 2007.  <u>Tr.</u> at 63.  Plaintiff testified, as did vocational expert Dr. James E. Lanier.  <u>Tr.</u> at 63.  Plaintiff testified that she had hallucinations, and that she was paranoid when around other people.  <u>Tr.</u> at 71.  However, she said that she had no problems caring for her children, and that she did not have any physical impairments.  <u>Tr.</u> at 71.  She testified that she had not been drinking or doing drugs for more than a year.  <u>Tr.</u> at 72.

Dr. Lanier testified that he was familiar with jobs available in the State of Illinois, and that he was familiar with Plaintiff's employment history.  <u>Tr.</u> at 73-74.  The ALJ instructed Dr. Lanier to assume a hypothetical person of Plaintiff's age, background, and physical abilities who was capable of doing simple, repetitive tasks with infrequent contact with co-workers or the public.  <u>Tr.</u> at 76.  The ALJ also had Dr. Lanier take into consideration the fact that Plaintiff had Hepatitis C.  <u>Tr.</u> at 76.  Dr. Lanier stated that this hypothetical individual would be capable of performing the jobs of mail sorter, assembler, and hand packager.  <u>Tr.</u> at 76.  He also testified that there were no transferable skills, but that there were other jobs available in the economy that would satisfy the criteria in the ALJ's hypothetical, such as a surveillance system monitor, a hand washer, eyeglass frame polisher, and

hand presser.  <u>Tr.</u> at 77.  Dr. Lanier testified that absenteeism of two days per month would be tolerated by an employer, and that medical leave would potentially cover missed days of work if the employee was in a psychiatric hospital.  <u>Tr.</u> at 78.

On February 18, 2008, the ALJ issued her second written Decision, again denying Plaintiff's claim for SSI.  <u>Tr.</u> at 11-21.  The ALJ again went through the five-step sequential evaluation process, finding that Plaintiff had not engaged in SGA since January 15, 1994.  <u>Tr.</u> at 13.  In addition to a severe impairment of depression, the ALJ found that Plaintiff had severe impairments of Hepatitis C and a history of substance addiction disorder. <u>Tr.</u> at 13.

However, the ALJ determined that none of the severe impairments met or equaled the relevant Listing criteria.  While there was no Listing for Hepatitis C specifically, Listing 5.05 covered chronic liver disease. However, Plaintiff had not provided medical evidence demonstrating that she met the Listing.  <u>Tr.</u> at 13.  The ALJ again found that Plaintiff's depression did not meet Listing 12.04.  While Plaintiff met the Paragraph A criteria, the ALJ determined that she did not meet the Paragraph B criteria.  The ALJ relied on the Plaintiff's own testimony, and the state

17

agency's conclusion that Plaintiff's daily activities were only mildly restricted by her depression. <u>Tr.</u> at 14. Plaintiff was able to function socially, the ALJ found, because she utilized public transportation and traveled to appointments on her own. <u>Tr.</u> at 14. The ALJ also found that Plaintiff had only a moderate restriction in concentration, persistence or pace under the Paragraph B criteria. <u>Tr.</u> at 14. The ALJ determined that Plaintiff did not meet the Paragraph C criteria because, although she had documented episodes of decompensation, they were due to her illegal drug use or noncompliance with medication, as opposed to her depression. <u>Tr.</u> at 14-15.

The ALJ went on to analyze Plaintiff's RFC, holding that she could perform medium exertional work, which involved lifting 25 pounds frequently and 50 pounds occasionally, and standing or walking for up to 6 hours in an 8-hour period. The ALJ limited Plaintiff to simple tasks and restricted contact with the public and co-workers. <u>Tr.</u> at 15. In coming to this conclusion, the ALJ relied on Plaintiff's testimony regarding her symptoms, but found that Plaintiff's descriptions of her limitations were not totally credible, in part because she was able to care for her children, one of whom was disabled. <u>Tr.</u> at 16. The ALJ pointed out that none of Plaintiff's

doctors had placed any restrictions on her activities, and that her GAF scores were consistently 50, which indicated only moderately severe symptoms. <u>Tr.</u> at 16. The ALJ catalogued Plaintiff's medical history, including her history of substance abuse and psychiatric treatment. <u>Tr.</u> at 16-19. Ultimately, the ALJ found that Plaintiff's medical problems only mildly limited her daily activities. <u>Tr.</u> at 19.

Plaintiff was able to return to her past work as a mail clerk, data entry clerk, retail cashier, small products line assembler, and hand packager, the ALJ held. In the alternative, the ALJ found that there were other jobs in the economy that Plaintiff could perform given her RFC, including surveillance system monitor and hand presser. <u>Tr.</u> at 19-20. Additionally, the ALJ relied on Dr. Lanier's testimony, and determined that even if Plaintiff had to miss 4 to 6 days of work for hospitalization, most employers would provide medical leave to accommodate Plaintiff's needs. <u>Tr.</u> at 20. Therefore, the ALJ held that Plaintiff was not disabled.

Plaintiff again appealed to the Appeals Council, but it denied her request on July 9, 2008. <u>Tr.</u> at 2. Plaintiff filed her Complaint for Judicial Review in this case on December 18, 2008. <u>Complaint (d/e 1)</u>.

19

<u>ANALYSIS</u>

Plaintiff seeks review of the ALJ's Decision on four grounds.  First, she argues that the ALJ erred by finding that she did not satisfy the criteria of Listing 12.04.  Plaintiff next asserts that the ALJ's findings regarding her past relevant work were not supported.  Third, Plaintiff argues that the ALJ's RFC determination was not supported by substantial evidence.  Plaintiff's last argument is that the ALJ's credibility determination was "clearly erroneous."  <u>Motion (d/e 10)</u>, p. 18.

Judicial review of the Commissioner's final determination of disability is limited, and the Commissioner's findings of fact are treated as conclusive as long as they are supported by substantial evidence.  42 U.S.C. § 405(g); <u>Halbrook v. Chater</u>, 925 F.Supp. 563, 571 (N.D.Ill. 1996).  "Substantial evidence" means evidence that "a reasonable mind might accept as adequate to support a conclusion."  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Powers v. Apfel</u>, 207 F.3d 431, 434 (7th Cir. 2000).  On review, courts may not reevaluate evidence, make new factual determinations, or substitute their judgment for that of the Commissioner.  <u>Powers</u>, 207 F.3d at 434-35.

Nonetheless, the Court must look to the record as a whole to determine if there is "substantial evidence" supporting for the ALJ's

Decision.  Stephens v. Heckler, 766 F.2d 284, 287 (7th Cir. 1985).  An ALJ's opinion need not evaluate "every piece of testimony and evidence submitted."  Zalewski v. Heckler, 760 F.2d 160, 166 (7th Cir. 1985).  All that is required is that the ALJ "considered the important evidence" in the opinion, thus allowing the courts to "trace the path of the ALJ's reasoning."  Stephens, 766 F.2d at 287.

In determining whether an individual is disabled for Social Security purposes, the ALJ must use the five-step sequence outlined in 20 C.F.R. §§ 404.1520(a) and 416.920(a).  Each step must be satisfied before moving on to the next step.  First, the ALJ determines if the claimant engages in "substantial gainful activity," (SGA) defined as work that involves significant physical or mental activities, usually done for pay or profit.  20 C.F.R. §§ 416.920(b), 416.972(a)-(b).  If the claimant is not involved in SGA, Step 2 requires the ALJ to decide whether the claimant has a medically determinable impairment that is "severe," or a combination of impairments that, taken together, are "severe."  20 C.F.R. § 416.920(c).  Severity is measured by whether an impairment significantly limits an individual's ability to perform basic work activities.  20 C.F.R. § 416.921; SSRs 85-28, 96-3p, 96-4p.  If such an impairment is found, the ALJ

21

proceeds to Step 3.

In Step 3, the ALJ evaluates whether the claimant's impairment meets criteria listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  If the  ALJ decides in the affirmative, the claimant is disabled.  If the claimant's condition is not equivalent to a Listing, the ALJ moves on to Step 4.  Step 4 requires the ALJ to determine the claimant's RFC.  The ALJ considers all impairments, not just those found to be severe under Step 2.  20 C.F.R. § 416.945.  The ALJ then determines whether the claimant has the RFC to perform past relevant work.

If the claimant is not able to perform past relevant work, the ALJ moves to Step 5, where she evaluates whether the claimant is capable of performing other work.  20 C.F.R. § 416.920(g).  The ALJ takes into consideration the claimant's RFC, age, education, and work experience.  At this juncture, the SSA is responsible for producing evidence that demonstrates that there is work suitable for the claimant in the national economy.  20 C.F.R. §§ 416.912(g), 416.960©.  If the ALJ determines that there is other work available to the claimant, the claimant is not disabled for purposes of SSI.

With these standards in mind and for the reasons described below, the

Court addresses each of Plaintiff's arguments in turn, and finds that the ALJ's Decision was not supported by substantial evidence.

I.  LISTING 12.04

Plaintiff first argues that the evidence in her case clearly demonstrates that she satisfied the criteria in Listing 12.04, and that the ALJ erred in holding to the contrary.  Plaintiff also asserts that the ALJ did not address her bipolar disorder.  The Commissioner counters that the ALJ's Decision was supported by substantial evidence, and that Plaintiff did not meet the Listing criteria.

A.  Depression Under Listing 12.04

Under Listing 12.04, a claimant must meet either both the Paragraph A and Paragraph B criteria, or meet the Paragraph C criteria.  20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.04.  The Paragraph B and Paragraph C criteria are:

[The Paragraph A criteria and]

B.  Resulting in at least two of the following:

1.  Marked restriction of activities of daily living; or
2.  Marked difficulties in maintaining social functioning; or
3.  Marked difficulties in maintaining concentration, persistence, or pace; or

      4.     Repeated episodes of decompensation, each of extended duration;

Or

C.     Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

      1.     Repeated episodes of decompensation, each of extended duration; or
      2.     A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
      3.     Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.04(B)-(C).

The Court finds that the ALJ's Decision at Step 3 was not supported by substantial evidence. Although the ALJ did not have to exhaustively evaluate each and every piece of evidence, she was required to "'build an accurate and logical bridge from the evidence to her conclusion.'" Steele v. Barnhart, 290 F.3d 936, 941 (7th Cir. 2002) (quoting Dixon v. Massanari, 270 F.3d 1171, 1176 (7th Cir. 2001)). The ALJ in this case failed to do.

The ALJ determined that although Plaintiff satisfied the Paragraph A criteria, she did not satisfy the Paragraph B or C criteria.  In coming to this conclusion, the ALJ relied on Plaintiff's testimony and on the opinions of Dr. Tin, the state agency physician.  However, the ALJ did not even mention the hundreds of pages of medical records Plaintiff provided to support her claim.[2]

For example, when discussing the social functioning criterion under Paragraph B, the ALJ did not evaluate or even mention extensive medical evidence indicating that Plaintiff was paranoid and had trouble interacting with other people.  She did not analyze Dr. Vincent's observation that Plaintiff was "hypervigilant" and "easily startled."  Tr. at 692.  Treatment notes consistently reflect Plaintiff's paranoia and mistrust of others.  See, e.g., Tr. at 512, 527, 529, 541, 633, 647, 692.  The same holds true for the other criteria under Paragraph B.

As far as the Paragraph C criteria go, the ALJ concluded that "there is no evidence of a chronic mental disorder that has . . . resulted [in] repeated episodes of decompensation, each of extended duration . . . ."  Tr. at 15.

―――――――――――――――――――

[2]The Court notes that the ALJ did discuss Plaintiff's medical records at Step 4 when determining Plaintiff's RFC.  However, that does not excuse the failure to consider those records at Step 3.

The ALJ does not mention or discuss the fact that Plaintiff was hospitalized for trying to commit suicide on the following occasions: November 27-29, 2003; April 3-11, 2005; June 6-14, 2005; January 20-23, 2006; and April 4-20, 2006.  See Tr. at 564, 313, 529, 633, 642.

Finally, the ALJ made several unsupported factual statements that are directly contradicted by evidence in the record.  For example, the ALJ stated that Plaintiff utilized public transportation to independently travel to medical appointments for herself and her children.  This conclusion was contrary to Plaintiff's testimony that her case-worker drove and accompanied her to appointments because Plaintiff was incapable of doing so on her own.  Tr. at 56-57.  The ALJ also stated, based on one treatment note, that Plaintiff was active in her church; Plaintiff testified that she no longer attended church, and other treatment notes indicated that she "was not active in [the] community" and that she had "no real friends" and "no longer trust[ed] anyone."  See Tr. at 45, 635.  The ALJ did not explain how she weighed this evidence, and the evidence she did cite is not sufficient for a "reasonable mind" to accept "as adequate to support a conclusion."  See Perales, 402 U.S. at 401.

In short, the ALJ failed to build a logical bridge between the evidence

26

and her conclusion at Step 3 regarding whether Plaintiff's depression satisfied Listing 12.04.  The Decision was not supported by substantial evidence.  Accordingly, the Court reverses the ALJ's Decision, and remands this matter for a new hearing.  At the hearing and in the written Opinion, the ALJ should take into consideration the record evidence as a whole, including the medical records, when evaluating each of the Paragraph B and Paragraph C criteria.

B.   Bipolar Disorder Under Listing 12.04

The Plaintiff also argues that the ALJ failed to consider her bipolar disorder when coming to a decision.  The Commissioner responds that the ALJ's mention of the disorder was sufficient.

However, the ALJ did not consider whether Plaintiff's bipolar disorder constituted a severe impairment at Step 1.  The medical records reflect that Plaintiff was diagnosed with bipolar disorder on more than one occasion. The fact that the ALJ mentioned this diagnosis in passing is not sufficient. See Villano v. Astrue, 556 F.3d 558, 562 (7th Cir. 2009) ("If the Commissioner's decision lacks adequate discussion of the issues, it will be remanded.").  On remand, the ALJ should evaluate the medical evidence surrounding Plaintiff's bipolar disorder at Step 1 to determine whether it

constitutes a severe impairment, and proceed from there, if necessary.

II.    <u>PAST RELEVANT WORK</u>

Plaintiff's second argument is that the ALJ's past relevant work analysis was erroneous.  The Commissioner argues that this is not the case, and, even if it was, Plaintiff was not harmed by the error because the ALJ articulated other relevant work available in the national economy that Plaintiff could perform given her RFC.

Under Social Security Regulations, past relevant work is that which "was done within the last 15 years, lasted long enough for [a claimant] to learn to do it, and was substantial gainful activity."  20 C.F.R. § 416.965(a).  "Off-and-on" work for "brief periods of time" during the 15-year period do not count.  <u>Id.</u>

Here, the ALJ did not adequately evaluate Plaintiff's past work experience to determine if it was past relevant work for Social Security purposes, despite the Appeals Council's directive that she do so.  <u>See</u> <u>Tr.</u> at 96-98.  The ALJ found that Plaintiff had not engaged in SGA since January 15, 1994, but concluded, without explanation, that Plaintiff had engaged in past relevant work.  The Court is unable to trace the path of the ALJ's reasoning in this regard, particularly when the record demonstrates that

several of Plaintiff's previous positions last only for a few months, which indicates that she only worked "off-and-on." See 20 C.F.R. § 416.965(a).

Furthermore, this error was not harmless. The Government is correct that the harmless error doctrine applies to cases seeking review of a determination of disability by the SSA. See Keys v. Barnhart, 347 F.3d 990, 994-95 (7th Cir. 2003) (Social Security case noting that the harmless error doctrine "is fully applicable to judicial review of administrative decisions"); see also Sahara Coal Co. v. Office of Workers Comp. Programs, 946 F.2d 554, 558 (7th Cir. 1991). However, although the ALJ proceeded to Step 5 and identified other jobs in the national economy that Plaintiff could perform, the Court finds below that the ALJ's RFC determination was not supported by substantial evidence. The jobs the ALJ identified at Step 5 were based on an erroneous RFC decision and an improper hypothetical question, and do not reflect Plaintiff's capabilities. Accordingly, Plaintiff was harmed by the ALJ's failure to properly consider whether her work experience constituted past relevant work.

Therefore, the ALJ's Decision is reversed and remanded for an accurate evaluation of whether Plaintiff's employment history is past relevant work under the Regulations.

III.  RFC FINDING

Plaintiff claims that the ALJ's RFC determination was not supported by substantial evidence because both it and the hypothetical question the ALJ posed to the vocational expert did not include all of Plaintiff's limitations.

While an ALJ considers medical evidence and subjective symptoms when making an RFC determination, the ALJ alone has ultimate responsibility for making the decision.  20 C.F.R. §§ 416.927(e)(2), 416.929(c)(3).  An ALJ's hypothetical question to a vocational expert is to "be supported by the medical evidence in the record."  Ehrhart v. Sec'y of Health and Human Servs., 969 F.2d 534, 540 (7th Cir. 1992) (quoting Meredith v. Bowen, 833 F.2d 650, 654 (7th Cir. 1987 )).  Additionally, the hypothetical question must "include all limitations supported by medical evidence in the record."  Stewart v. Astrue, 561 F.3d 679, 684 (7th Cir. 2009).  Merely limiting a claimant to "simple" tasks does not adequately address a claimant's moderate limitations of concentration, persistence, and pace.  Id. at 685; see Young v. Barnhart, 362 F.3d 995, 1004 (7th Cir. 2004); Ramirez v. Barnhart, 372 F.3d 546, 554 (3rd Cir. 2004) (holding that hypothetical restricting claimant to one- or two-step tasks did not

30

account for limitations in concentration).  If the hypothetical does not include all of a claimant's limitations, the record must demonstrate that the vocational expert knew and understood the extent of the claimant's limitations by, for example, evaluating medical records and testimony. Young, 362 F.3d at 1003.

Here, the ALJ posed this hypothetical question to Dr. Lanier:

> Q:   . . .  I want you to assume, if you will, a hypothetical person, age of 39 with a past -- with a GED and past relevant work same as the claimant.  I'm going to ask you to assume that this person is capable of -- she said she has no physical condition so a full range of work with the following limitations, however.  This person would only be able to do simple repetitive [tasks]; the occasional interaction with public, co-workers and supervisors.
> . . .
> Then with the Hepatitis C, Dr. Lanier, go ahead with the medium work then.

Tr. at 75-76.  After Dr. Lanier presented his conclusion that Plaintiff could perform the past work of mail clerk, assembler, and hand packager, the ALJ followed up by asking, "Do you believe that those three jobs would still be available and they would meet the limitations of very little interaction and simple, repetitive?"  Tr. at 76.  Dr. Lanier answered in the affirmative.  After Dr. Lanier presented other available jobs, the ALJ asked: "And do all of these jobs accommodate the simple repetitive that I asked you to consider?",

and again Dr. Lanier said, "Yes." <u>Tr.</u> at 77.

The Court finds that the ALJ's hypothetical question was not supported by substantial evidence because it did not include all of Plaintiff's limitations.   The ALJ specifically found that Plaintiff had moderate limitations in terms of concentration, persistence and pace, and translated those limitations to simple tasks. <u>Tr.</u> at 14.  The <u>Stewart</u> Court confronted this exact scenario, and found that the hypothetical question was insufficient: "The Commissioner asserts that the ALJ accounted for Stewart's limitations of concentration, persistence, and pace by restricting the inquiry to simple, routine tasks that do not require constant interactions with coworkers or the general public.  We have rejected the very same contention before."  <u>Stewart</u>, 561 F.3d at 684-85.

Additionally, there is no evidence from the record that Dr. Lanier, the vocational expert, had full knowledge of Plaintiff's limitations.  Although he reviewed Plaintiff's testimony and prior work history, the record does not reflect that he examined treatment notes or other medical records laying out Plaintiff's impairments.  The ALJ's hypothetical question was not based on

substantial evidence.[3]

In light of the fact that the hypothetical question in this case was not supported by substantial evidence, it follows that the ALJ's RFC determination was also unsupported by substantial evidence. The ALJ found that Plaintiff had the RFC to:

> [P]erform medium exertional work with the ability to lift up to 25 pounds frequently and 50 pounds occasionally, and stand/walk for up to 6 hours in an 8 hour period. [Plaintiff]'s mental impairments limit her to simple work activity consisting of 1-2 step instructions and limited contact with the public, supervisors or co-workers.

Tr. at 15.

However, as discussed above, merely restricting Plaintiff to "simple" or "1-2 step" tasks does not adequately account for her moderate limitations in concentration, persistence or pace. And while the hypothetical question took into account the possibility of absenteeism due to psychiatric hospitalization, the RFC did not. The ALJ did not construct a logical bridge

---

[3]Plaintiff also argues that the ALJ's hypothetical failed to take into consideration the fact that Plaintiff's depression and bipolar disorder would cause her to be away from work frequently. However, the ALJ asked Dr. Lanier about absenteeism: "[F]or instance, if someone were to be admitted to a psychiatric hospital for four or five, six days at a time, how would that affect the ability to maintain employment?" Tr. at 78. Dr. Lanier responded that Plaintiff would be able to use medical leave for such hospital stays, and that most employers would tolerate an employee having to be hospitalized without it negatively impacting employability. Tr. at 78.

between Plaintiff's limitations and the RFC, and therefore, the RFC decision is reversed and remanded.

IV.   CREDIBILITY DETERMINATIONS

Finally, Plaintiff asserts that the ALJ made a clearly erroneous credibility assessment when evaluating Plaintiff's testimony at Step 4.  The Commissioner counters that Plaintiff's subjective testimony was unsupported by the medical evidence.

An ALJ's credibility determination is entitled to "considerable weight," and thus a court will only overturn such a determination if it is "patently wrong."  Kelley v. Sullivan, 890 F.2d 961, 964, 965 (7th Cir. 1989); Herr v. Sullivan, 912 F.2d 178, 182 (7th Cir. 1990).  Reversal is warranted only if the ALJ's credibility finding is "an observation or argument that is unreasonable or unsupported . . . ."  Sims v. Barnhart, 442 F.3d 536, 538 (7th Cir. 2006).  While an ALJ considers a claimant's subjective symptoms, the ALJ is free to reject the evidence if it is not otherwise supported by the evidence in the record.  20 C.F.R. § 414.929(a); see Cass v. Shalala, 8 F.3d 552, 555 (7th Cir. 1993) ("[The law] does not compel an ALJ to accept wholly the claimant's perception of a disability.").

Here the ALJ found that Plaintiff's subjective symptoms did not match

up with the reports of her physicians, none of whom placed any restrictions on Plaintiff's activities because of her mental condition. This determination was not unreasonable. The ALJ specifically credited Plaintiff's testimony in portions of the written Opinion, and disregarded it when it did not comport with the objective medical evidence in the record. Plaintiff has pointed to no evidence in the record supporting her claim that the ALJ's credibility assessment was "clearly erroneous." Accordingly, the Plaintiff's request is denied in this regard.

<u>CONCLUSION</u>

Therefore, Plaintiff's Motion for Summary Judgment or Remand (d/e 9) is GRANTED. The Commissioner's Motion for Summary Affirmance (d/e 13) is DENIED, and her Decision is REVERSED to the extent outlined above. This matter is remanded pursuant to 42 U.S.C. § 405(g), Sentence 4, for a re-hearing on whether Plaintiff's severe impairments satisfy the Listing criteria, whether her past employment constitutes past relevant work, and a re-evaluation of Plaintiff's RFC. All pending motions are DENIED as MOOT. This case is closed.

IT IS THEREFORE SO ORDERED.

ENTER:   January 14, 2010

FOR THE COURT:


_____s/  Jeanne E. Scott_____
JEANNE E. SCOTT
UNITED STATES DISTRICT JUDGE